THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 15, 2010



_____
Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

IN RE:    GORDON WARD and          Case No. 08-26106-PP
            LISA MARIE WARD,

            Debtor.                Chapter 7

_____

MICHAEL G. LEVINE and
JAIME D. LEVINE,

            Plaintiffs,

v.                             Adv. No. 08-2240-PP

GORDON WARD,

            Defendant.

_____

**MEMORANDUM DECISION FINDING IN FAVOR OF PLAINTIFFS,
AND FINDING THE DEFENDANT'S DEBT TO THE PLAINTIFFS
NONDISCHARGEABLE**

_____

      The plaintiffs, who purchased a home from the defendant in 2007, allege

that the defendant incurred a $20,000 debt to them when he (a) induced them

to give him the $20,000 through false representations that his company would

use that money to perform post-purchase construction work on the property,

1

and (2) committed fraud and defalcation in a fiduciary capacity when he used the money for something other than the construction work, in violation of Wisconsin's theft-by-contractor statute. The Court finds that while the plaintiffs did not prove that the defendant made false representations, they did prove that he committed defalcation in a fiduciary capacity when he used the $20,000 to pay the closing costs on the property. The Court therefore finds in favor of the plaintiffs, and finds that the defendant owes a $20,000 debt to the plaintiffs which is nondischargeable. It orders the parties to submit argument and support regarding the plaintiffs' request for punitive damages, costs and fees no later than the close of business on April 2, 2010.

I.    FACTUAL BACKGROUND

    A.    Procedural History

On August 17, 2007, Michael and Jaime Levine filed suit in Ozaukee County Circuit Court, naming as defendants Ward Builders and its president, Gordon Ward. Michael Levine, et al. v. Gordon Ward, et al., docket no. 2007-CV-000428, Ozaukee County Circuit Court. The basis for the suit was a contract dispute.

Almost six months later, on February 2, 2008, Ward Builders, Inc. filed a Chapter 7 petition in the bankruptcy court for the Eastern District of Wisconsin. Docket no. 08-20906-PP. On June 4, 2008, the defendant (Ward Builders' president, Gordon Ward) followed suit, filing a joint Chapter 7 petition with his wife, Lisa Marie Ward, in the same district. Docket no. 08-26106-PP.

The plaintiffs subsequently filed this adversary proceeding, naming as the original defendants Ward Builders and Gordon Ward. Docket no. 1. At a hearing on March 25, 2009, the parties orally stipulated to the dismissal of defendant Ward Builders, docket no. 11, and the Court issued an order dismissing Ward Builders from the case on March 26, 2009, docket no. 12.

B.   Factual Background

In the fall of 2006, plaintiffs Michael and Jamie Levine began negotiating with Ward Builders, Inc. to purchase a house that Ward Builders had constructed at 1420 W. Stillwater Court, Mequon, Wisconsin ("the Property"). Docket no. 14, Plaintiffs' Exhibit 1, Defendant's Exhibit 101. The negotiations were protracted, lasting through the fall of 2006 and into the winter of 2007. In particular, the plaintiffs wanted Ward Builders to make certain changes to the Property, including installing some egress windows on the lower level, building a formal dining room, and converting one of the garage stalls into a living space that would include a nursery for the baby the couple expected. Id. at Plaintiffs' Exhibit 1. Much of the back-and-forth that took place during the negotiations had to do with this additional work–how much it would cost, whether those costs would be part of the overall purchase price of the property, when Ward Builders could do the work, etc. Id. at Plaintiffs' Exhibits 1-3, Defendant's Exhibit 101.

In late November 2006, the plaintiffs made an offer on the Property. Ward, through its agent, responded that the plaintiffs would have to agree to

3

close the sale before Ward would start the remodeling. Ward indicated that if the plaintiffs were not willing to agree to that requirement, the sale could not take place. Id. at Plaintiffs' Exhibit 4. The negotiations continued, with the parties discussing a separate contract for the remodeling. *See, e.g.*, Id. at Plaintiffs' Exhibit 5.

On December 26, 2006, the plaintiffs signed an offer to purchase the Property for $731,500, with a $5,000 earnest money payment. Id. at Plaintiffs' Exhibit 8. The offer to purchase provided that the closing would take place no later than February 15, 2007. Id. There were addenda attached to the offer, one of which was a December 26, 2006 summary of the remodeling that was to take place. Id.

The summary described the conversion of the garage into a nursery, the installation of hardwood floors in various parts of the house, the installation of egress windows and the construction of the formal dining room. Id. At the end of the summary was a breakdown of costs. This breakdown reflected a "list price with no credit" of $709,900, along with additional costs of $17,000 for the construction of the nursery, $16,400 for the installation of the hardwood flooring, $6,000 for installation of the egress windows, and $25,000 for the construction of the dining room addition. Id. on page 3 of 3. If one adds up those amounts, one comes up with a total of $774,300. The cost summary on the addendum, however, listed the "home purchase with improvements contract price" as $731,500–$42,800 less than the sum of the listed costs. Id.

4

The addendum said that the $731,500 was "due at closing." In addition, the addendum tacked on $25,000 for "construction (dining room w/crawl space) contract," for a "total" of $756,500.00." Id.

At the end of the addendum, there was a paragraph indicating that the plaintiffs and Ward Builders would agree on the specific construction terms within ten (10) days of offer acceptance, that Ward Builders would begin construction upon the plaintiffs paying a nonrefundable $35,000 deposit, and that the $35,000 payment would be credited to the plaintiffs-buyers upon closing. Id.

The agent for Ward Builders signed the offer to purchase, indicating acceptance of the offer, on December 29, 2006. Id. On January 8, 2007, the plaintiffs wrote a $35,000 check payable to Ward Builders, Inc., with the words "earnest money 1420 W. Stillwater" on the "memo" line. Id. at Plaintiffs' Exhibit 9.

On February 20, 2007, the parties executed an amended offer to purchase. Id. at Plaintiffs' Exhibit 1. This amended offer changed the closing date from February 15, 2007 to February 28, 2007. It also changed the purchase price, from $731,500 to $706,044.00. The amended offer indicated that the $706,044.00 included "the base price of $692,100.00 without carpet plus $13,944.00 for maple hardwood flooring of the same caliber and quality as used in the existing dwelling," to be installed in various areas in the house. The amended offer also stipulated that "[t]he 3-page remodel and cost

5

summary attached to the offer is deleted from this offer. Any remodeling to the existing, completed home will be handled between buyer and seller after closing via a building contract." Id.

On February 19, 2007, Ward Builders drafted a document entitled "Building Contract." Id. at Plaintiffs' Exhibit 12. This was a six-page document that called for the "[c]onstruction of a New Formal Dining Room to be added onto an existing Single Family Residence," as well as the construction of "additional Living Space within an existing Garage Stall" and "[i]nstallation of Egress Windows to an existing Lower Level Foundation." Id. at p. 1. For the most part, this new "Building Contract" provided for Ward Builders to do all of the things it had agreed to do in the original offer to purchase, but under separate contract.

The "Building Contract" provided that Ward Builders would complete all of the contracted-for work by June 30, 2007. Id. at p. 2. The price of the entire construction contract was $48,000, and the contract provided for the plaintiffs to pay $18,000 at the time of the signing of the contract "before construction begins as a deposit and part of the purchase price of this project." Id. Defendant Gordon Ward signed the "Building Contract;" there is no date next to his signature. The plaintiffs each signed the "Building Contract" on February 20, 2007. Id. at p. 6.

On the same date–February 20, 2007–defendant Gordon Ward and plaintiff Michael Levine signed a document entitled "Construction of New

6

Formal Dining Room," which laid out in detail the specifications for the new dining room, and which indicated that Ward Builders would start construction around April 1, 2007 and would complete it with 90 days of the start. Id. at Plaintiffs' Exhibit 13. On that same date, defendant Gordon Ward signed a "Receipt of Payment," which indicated that the plaintiffs had provided Ward Builders with "a down payment in the amount of $20,000.00 (Twenty Thousand dollars) towards the construction of a Nursery Suite, Formal Dining Room and installation of Egress Windows located at 1420 W. Stillwater Court, Mequon, WI 53092, per Building Contract dated February 19, 2007."

Plaintiffs' Exhibit 15 shows that Michael Levine obtained a cashier's check dated February 28, 2007–the date of closing specified in the amended offer to purchase–in the amount of $20,000, made payable to Ward Builders, Inc. And Plaintiffs' Exhibit 16 shows that on that same date, the sum of $20,000 was deposited into Ward Builders' account at AnchorBank.

The parties closed the sale of the Property on February 28, 2007, as indicated in the Seller's Closing Statement and Rider. Id. at Plaintiffs' Exhibit 17. The closing statement shows, however, that while the plaintiffs owed the purchase price of $706,071.20 on the closing date, Ward Builders owed $733,439.99 to close the sale. Id. There were a number of closing costs for which Ward Builders was responsible–the seller's commission, some taxes and title charges, the balance remaining to pay off the mortgage held by AnchorBank, some utility bills, and so forth. Id. Accordingly, at the time of

7

the closing, Ward Builders owed $27,368.79 more than the purchase price it had agreed upon with the plaintiffs. Id.

The bank statements from the Ward Builders bank account show that Ward Builders did not have $27,368.79 in its account as of February 28, 2007. Id. at Plaintiffs' Exhibit 19. Rather, the statements show that as of February 28, 2007, Ward Builders had $7,471.57 in the bank–and that it had bounced three checks in the previous week. Id. Nonetheless, a check dated February 28, 207 in the amount of $27,236.79 was issued on the Ward Builders account (signed by defendant Gordon Ward), made payable to Port Abstract and Title." Id. at Plaintiffs' Exhibit 18. The bank records indicate that what allowed Ward Builders to make this payment was the deposit of the $20,000 Ward Builders obtained from the plaintiffs on February 28, 2007. Id. at Plaintiffs' Exhibit 17, p. 2.

The trial exhibits corroborate Michael Levine's trial testimony indicating that all did not go smoothly after the closing. On June, 13, 2007–some 75 days after the construction was to have started on the Property–defendant Ward sent a letter to the plaintiffs. Id. at Defendant's Exhibit 103. On June 18, 2007, Attorney Robert Levine (plaintiff Michael Levine's father) sent a letter to defendant Gordon Ward. Id. at Plaintiffs' Exhibit 20. Both of these letters discuss the fact that on June 13, 2007, an excavating service appeared at the Property to begin the construction project. At trial, the parties' witnesses

8

provided different accounts of what happened that morning and why, but the upshot was that the excavator left without beginning the project.  Id.

Defendant Ward's letter indicated that "[Michael Levine] was angry about the timing of the excavation and reused to allow the excavation to take place until he received a letter from Ward Builders, Inc. assuring him that anything disturbed by the excavation and construction would be returned back to existing as intended."  Id. at Defendant's Exhibit 103.  He stated that the reason that Ward Builders had not started the project earlier was due to weather, and that because plaintiff Levine had "threatened Ward Builders, Inc. with a lawsuit several times" and used "foul language," Ward Builders considered that it had been "ordered off the job" and that the contract had been canceled.  Id.  David Watry, a former Ward Builders employee who testified at trial, testified to a somewhat similar version of events.

Attorney Levine's letter indicated that because the plaintiffs had put in grass, a sprinkler system and an electric fence since buying the property, any excavation at that point would disrupt all of those improvements.  Id. at Plaintiffs' Exhibit 20.  He pointed out that the "Building Contract" required Ward Builders to complete construction by June 30, 2007, which clearly could not occur, and opined that Ward Builders was in breach of the terms of the "Building Contract."  He also stated that he expected Ward Builders to return the $20,000 deposit to him to hold in trust until the parties could resolve the matter.  Id.  At trial, Michael Levine agreed that he had been angry on the

9

morning of June 13, 2007; he explained that this was because the excavating service had showed up over two months later than expected, and was causing damage to the work the Levines had done on the outside of the Property.

The parties continued to interact during June and July 2007, with employees of Ward Builders communicating with Attorney Levine about trying to "finish the work," id. at Plaintiffs' Exhibit 22, trying to work on a punch list of items that needed completing, id. at Plaintiffs' Exhibits 23 and 24, and drawing up "new plans" to be submitted to the city for approval, id. at Plaintiffs' Exhibit 25. But on August 9, 2007, John Pavelich–the construction manager for Ward Builders–sent Attorney Levine a letter which stated, "Ward Builders has decided after careful consideration, not to move forward with the remodel contract at the above listed residence." The letter indicated that Ward Builders "would like to come up with a payment plan to reimburse Michael and Jaimie for the downpayment." Id. at Plaintiffs' Exhibit 26.[1]

Three weeks later, Pavelich sent a letter to the attorney who eventually would represent Ward Builders in its bankruptcy case, explaining Pavelich's view of why the plaintiffs had given Ward Builders $20,000 on February 28, 2007. Id. at Plaintiffs' Exhibit 27. He stated that

> Michael Levine was informed by Ward Builders, Inc. that
> Ward Builders, Inc. needed to bring $27,368.79 to the closing in

---

[1]  John Pavelich was not a witness at the trial. Apparently he has absented himself from the area, and the parties did not know where he was or how to reach him.

10

order for the closing to happen. Michael was informed that Ward Builders, Inc. did not have the money necessary to close. Michael was asked to pay Ward Builders, Inc. $25,000, which would be credited back to Michael as a down-payment on the remodel/addition work to be done in the future on the 1420 W. Stillwater Court property he was purchasing. Michael was able to come up with $20,000.00. Ward Builders, Inc. used Michael's $20,0000.00 plus $7,368.79 of their money to close on the Stillwater Court property. Michael was aware of how the $20,000.00 was going to be used.

Three weeks after Pavelich sent this letter to the bankruptcy attorney, Ward Builders filed for Chapter 7 protection. Id. at Plaintiffs' Exhibit 28.

At some point, the Mequon Police Department began investigating what had happened. On January 4, 2008, David Watry–who had been involved in the ill-fated June 13, 2007 excavation episode–wrote a "witness statement" for the police. Id. at Defendant's Exhibit 105. In this statement, Watry provided a variation on the version of events Pavelich had given to the bankruptcy attorney. Watry stated,

> After receiving a tentative closing statement . . . John Pavelich told me it would be impossible to close on the house because Ward Builders needed to bring an additional $30,000.00 to the closing. Ward Builders did not have the money. There were several liens against the property. I believe there were tax liens along with several liens from unpaid vendors who supplied material or material and labor for the house. Ward Builders would be unable to clear the title without paying the $30,000.00 out of pocket. Ward Builders' pockets were empty. John asked me f [sic] I thought Michael would be willing to make a down payment on the additions etc. to the house. I told John it would not hurt to ask since the deal would be dead without the money. I asked Michael to come to our office for a meeting. At the meeting John Pavelich and I explained the situation to Michael. We told Michael we needed a down payment of $30,000.00 for the additions, renovations and upgrades in order to get a clear title for the

11

property and be able to close at the end of February. Without the
$30,000.00, there could not be a closing. Michael said he would
think about it. Within a couple of days, Michael said he would give
us $20,000.00 as a down payment and Ward would have to come
up with the rest of the money to close.

Defendant's Exhibit 105.

## II.   JURISDICTION

This case involves a proceeding to determine the dischargeability of a

particular debt. As such, it is a "core proceeding arising under title 11,"

pursuant to 28 U.S.C. §157(b)(2)(I), and therefore this Court has jurisdiction

over it.   *See also* 28 U.S.C. §1334(a).

## III.   ISSUES PRESENTED

    A.   Whether the defendant, in violation of 11 U.S.C. §523(a)(2)(A),
induced the plaintiffs to give him $20,000 by making "false
representations" to the plaintiffs when he told them that he would
perform the work called for in the "Building Contract," and that he
would use the $20,000 to do so; and

    B.   Whether the defendant commit fraud or defalcation in a fiduciary
capacity in violation of 11 U.S.C. §523(a)(4) when he used the
$20,000 for something other than paying for the contracted-for
construction work.

## IV.   LEGAL ANALYSIS

    A.   Burden of Proof

"[T]o prove that a debt is nondischargeable, the creditor bears the burden

of proof by a preponderance of the evidence." Matter of Bero, 110 F.3d 462

(7th Cir. 1997) (citing Grogan v. Garner, 498 U.S. 279 (1991)). The creditor

must prove each of the elements under 11 U.S.C. §523 by a preponderance of

the evidence, and courts construe exceptions to discharge strictly against the

creditor.  Matter of Bero, 110 F.3d at 465; Goldberg Secs., Inc. v. Scarlata

(Matter of Scarlata), 979 F.2d 521, 524 (7th Cir. 1992).

> B. The plaintiffs have not proven by a preponderance of the evidence that the defendant incurred the debt as the result of a false pretenses in violation of 11 U.S.C. §523(a)(2)(A).

In Count I of the complaint, the plaintiffs alleged that:

> The defendant . . . individually and as an officer and director of his corporation fraudulently misrepresented the terms and conditions of the construction agreement entered into between the parties . . . to induce the plaintiffs . . . to buy the house located at 1420 West Stillwater Court, Mequon, Wisconsin knowing that the defendants were not going to proceed with the construction of a new formal dining room and installation of egress windows to an existing lower level foundation and that the defendants were going to keep and use the deposit and not complete the project by June 30, 2007 as agreed upon by the parties in violation of 11 USC Sec. 523(a(2)(A) [sic] Further, the plaintiffs, . . . reasonably relied on the representation of the defendant . . . to their detriment with the end result being that they overpaid for the house due to the false representations of said defendant and did not get the agreed upon improvements on said house.

Section 523(a)(2)(A) states in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by— false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523(a)(2)(A).  This Code provision illustrates the Supreme Court's

observation in Cohen v. de la Cruz, 523 U.S. 213, 217 (1998) that the

"Bankruptcy Code has long prohibited debtors from discharging liabilities

Case 08-02240-pp    Doc 17    Filed 03/15/10    Page 13 of 43

incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" (Citations omitted).

Section 523(a)(2)(A) supports three causes of action: "actual fraud, false pretenses, and a false representation." In re Burke, 405 B.R. 626, 645 (Bankr. N.D.Ill. 2009). In Count I of the complaint, the plaintiffs alleged that the defendant "fraudulently misrepresented" certain facts, and that they relied upon those "fraudulent misrepresentations" to their detriment. It appears, therefore, that the plaintiffs alleged that the defendant violated the "false representation" prong of §523(a)(2)(A).

The district court for the Eastern District of Wisconsin has held that

> [t]o prevail on a false pretenses claim, the creditor must show that the debtor obtained the money "through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation." *In re Sheridan*, 57 F.3d 627, 635 (7th Cir.1995) (citation omitted). The creditor must also prove that the debtor acted with an intent to deceive and that the creditor relied on the debtor's misrepresentations. *Id.*

In re Landry, ___ F. Supp.2d ___, 2009 WL 959421, at *1 (E.D.Wis. April 7, 2009). *See also*, In re Burke, 405 B.R. at 645 (to prove a claim of false pretenses or a false representation under § 523(a)(2)(A), the plaintiffs must prove that "(1) the [defendant] made a false representation of fact (2) which the [defendant] (a) either knew to be false or made with reckless disregard for its

14

truth and (b) made with an intent to deceive; and (3) the [plaintiff] justifiably relied on the false representation.")

The plaintiffs argue that when the defendant represented to them that Ward Builders was going to build the formal dining room and install the egress windows, and that he was going to use the $20,000 to do so, he was making false representations. The complaint alleges that the defendant knew that he was not going to build the dining room or install the windows. The complaint further alleges that at the time he made the representations, the defendant knew that he was going to keep the $20,000, rather than use it to do the construction. Finally, the complaint alleges that the defendant knew that he was not going to complete the project by June 30, 2007 as the parties had agreed.

At least one court has held that "[f]alse representations must concern present or past asserted facts. . . . Representations or promises to do future actions do not qualify unless debtor never intended to perform." In re Pawlinski, 170 B.R. 380, 393 (Bankr. N.D. Ill. 1994), citing In re Bercier, 934 F.2d 689 (5th Cir. 1991) and In re Rubin, 875 F.2d 755 (9th Cir. 1989). The Pawlinski court's premise is logical. People often promise to do things that they fully intend to do at the time they make the promise. Later, they become unwilling, or unable, to fulfill the promise. This does not mean that they were making a "false representation" at the time they made the promise. Under this reasoning, the defendant's promise to build the plaintiffs a dining room and to

15

install their egress windows does not qualify as a "false representation" for the purposes of §523(a)(2)(A).

Even if a representation that one will perform some future act can constitute a "false representation," such a representation is "false" only if, at the time the proponent made it, he knew full well that he had no intention of performing the future act. As Judge Kelley said in <u>In re Trevisan</u>,

> Proof of intent for purposes of § 523(a)(2)(A) must be measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services. *In re Iaquinta,* 95 B.R. 576, 578 (Bankr.N.D.Ill.1989). Therefore, subsequent acts of fraud or omission do not establish that the debtor had the requisite intent at the time the representations were made. *Citibank (S.D.) v. Harris (In re Harris),* 203 B.R. 117, 121 (Bankr.N.D.Ill.1996). This is because the debtor may have had the appropriate intention at the time of the transaction, but failed to act because of a change in the debtor's circumstances. *Id.*

<u>In re Trevisan</u>, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003).

Thus, in order for the plaintiffs to prove that the defendant's representations were false, they needed to prove that he knew at the time he made them that neither he nor Ward Builders ever would build the dining room or install the windows. The plaintiffs presented no such proof. True, in the end, the defendant did not build the dining room or install the windows. But he appears to have made efforts to do so. Michael Levine and David Watry testified at trial–and a letter from the defendant to the plaintiffs dated June 13, 2007 corroborates the occurrence, if not the details–that on June 13, 2007 the defendant sent the excavating firm to the Property to start working on the

16

dining room. Defendant's Exhibit 103. The firm did not end up doing the work, and as noted in the Factual Background above, the parties have sharply differing views on why it did not happen. But the fact remains that the excavation firm did appear, and appeared at the defendant's direction.

Plaintiffs' Exhibit 22 is a memo from John Pavelich to Attorney Robert Levine, dated June 28, 2007, asking to meet with Attorney Levine to discuss "finish[ing] the work."[2] On July 17, 2007, Pavelich sent Attorney Levine a memo indicating that he needed to redraw the plans for the project and submit them to the city. Plaintiffs' Exhibit 25. Not until August 9, 2007 did Ward Builders inform the plaintiffs, via a letter to Attorney Levine, that it no longer planned to do the work. Plaintiffs' Exhibit 26.

These subsequent events provide circumstantial evidence that at the time the defendant told the plaintiffs that Ward Builders was going to build the dining room and install the windows, he intended that Ward Builders do so.

Similarly, these facts argue against the conclusion that the defendant made these representations intending to deceive the plaintiffs. Again, the Court looks to Judge Kelley's decision in <u>Trevisan</u> for the proposition that

> fraudulent intent on the debtor's part must be shown in order to establish the requisite fraud under § 523(a). *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir.2000). Since fraudulent intent rarely can be proven directly, "[i]t must be inferred from the surrounding

---

[2] It is not clear whether, in referring to "the work," Pavelich was referring to the punch list of detail items that had not yet been taken care of or the separate construction project called for in the "Building Contract."

17

circumstances." *In re Levitsky*, 137 B.R. [288] at 290 [Bankr. E.D.Wis. 1992]. If there is room for an inference of honest intent, the issue of intent must be resolved in favor of the debtor. *Rembert v. Citibank South Dakota, N.A.*, 219 B.R. 763, 767 (E.D.Mich.1996), aff'd, 141 F.3d 277 (6th Cir.1998), *cert. denied*, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998).

In re Trevisan, 300 B.R. 708 at 717.

The plaintiffs pointed out that Ward Builders filed for Chapter 7 protection in February 2008, and that as of August 28, 2007 (a week or so after the plaintiffs filed suit against the defendant and Ward Builders in state court), Ward Builders was communicating with a bankruptcy attorney. Plaintiffs' Exhibit 27 is a letter from John Pavelich to the attorney who ended up representing Ward Builders in its bankruptcy. The letter is dated August 28, 2007, and discusses the $20,000 debt at issue in this case. One could infer from that letter that as of August 2007, the defendant–an officer of Ward Builders–was contemplating putting Ward Builders into bankruptcy. Again, however, this does not prove that in December 2006 and January and February 2007, when the plaintiffs were negotiating with Ward Builders and the defendant for the construction of the dining room and the installation of the egress windows, the defendant knew that he never would perform that construction.

The plaintiffs also alleged in the complaint that at the time he made the alleged false representations, the defendant knew that he was "going to keep and use the deposit," and that he was not going to "complete the project by

18

June 30, 2007." Again, the plaintiffs presented no evidence that when he negotiated the "Building Contract" in mid-February 2007, the defendant knew that he was not going to be able to complete the contracted-for work by June 30, 2007. The evidence does indicate, as the Court will discuss in more detail in section IV(C) below, that at the time he took the $20,000 deposit from the plaintiffs, the defendant planned to kind of "borrow" it–in the short term–to pay Ward Builders' closing costs. The evidence indicates, however, that somehow–even after applying the $20,000 to closing costs–the defendant still planned to perform the construction work. It isn't clear how he thought he was going to pay for it–perhaps by using funds paid to him by some other customer from some other project. This plan may have been unreasonably optimistic; in hindsight, it proved to be. But that does not prove that at the time he made the representations, the defendant did not intend to fund the plaintiffs' construction project somehow.

The evidence provides room for the "inference of honest intent" of which Judge Kelley spoke, and thus the Court finds that the plaintiffs have not met their burden of proving false representations or an intent to deceive.[3] Accordingly, the Court finds that the plaintiffs have not proven that their debt

---

[3] Because the Court finds that the plaintiffs did not meet their burden of proof with regard to the first elements of a sec. 523(a)(2)(A) cause of action, it need not reach the issue of whether the plaintiffs justifiably relied on the defendant's false representations.

19

is nondischargeable under 11 U.S.C. §523(a)(2)(A), and the Court finds in favor of the defendant on Count I of the complaint.

C. <u>The plaintiffs have proven by a preponderance of the evidence that the defendant incurred the debt as the result of committing defalcation in a fiduciary capacity in violation of 11 U.S.C. §523(a)(4).</u>

Count II of the complaint alleged a cause of action under §523(a)(4). The plaintiffs alleged that the defendant,

> individually and as an officer of his corporation, obtained the sum of $20,000 from the plaintiffs . . . as a deposit for the construction of the new formal dining room and installation of egress windows and failed to use the funds for this purpose contrary to Section 779.01(5) Section 770.16 of Wisconsin Statutes which govern Theft by Contractor and breached the fiduciary duty owed to said Plaintiffs in violation of 11 USC Sec. 523(a)(4).

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." There are three elements that a plaintiff must prove by a preponderance of the evidence in order to prove a §523(a)(4) nondischargeability claim for fraud or defalcation in a fiduciary capacity: 1) that a trust existed; 2) that the defendant was a fiduciary of that trust; and 3) that the defendant committed "fraud or defalcation" while acting as a fiduciary of the trust. <u>Chase Lumber & Fuel Co. v. Koch (In re Koch)</u>, 197 B.R. 654, 656 (Bankr. W.D. Wis. 1996); *see also*, <u>In re Eisenberg</u>, 189 B.R. 725, 730 (Bankr. E.D. Wis. 1995).

 "Although the definition of 'fiduciary' in [the] context [of a nondischargeability proceeding] is a narrowly defined question of federal law,

Case 08-02240-pp    Doc 17    Filed 03/15/10    Page 20 of 43

bankruptcy courts look to state law to determine whether the requisite trust relationship exists." Fischer Constr., LLC and Team Fischer, Inc. v. Ecker (In re Ecker), 400 B.R. 669, 671-72 (Bankr. E.D. Wis. 2009), citing In re Bowles, 318 B.R. 129, 138 (Bankr. E.D. Wis. 2004). This Court, therefore, looks to Wisconsin law to determine whether a trust existed.

The complaint cited two sections of the Wisconsin statutes in support of the plaintiffs' that a trust existed. First, it referenced Wis. Stat. §779.01(5). That statute provides as follows:

> ASSIGNMENT OF LIEN. GARNISHMENT. Assignment of a claim or right to a lien or any part thereof by a prime contractor, or garnishment by the creditor of a prime contractor, subcontractor, supplier, service provider, laborer or mechanic, shall not operate to compel the owner, prime contractor, subcontractor, supplier, or service provider to pay the assignee or creditor until the lien claims of subcontractors, suppliers, service providers, and laborers under this subchapter have either been paid in full, matured by notice and filing or expired. If such claims become liens, the owner, prime contractor, subcontractor, supplier, or service provider shall be compelled to pay such assignee or creditor only what remains due in excess of such liens.

Second, the complaint referenced Wis. Stat. §779.16. That statute states, in pertinent part:

> **Theft by Contractors**. All moneys . . . paid to or to become due to any prime contractor or subcontractor for public improvements are a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications performed, furnished, or procured for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those

21

which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20.

As far as the Court can tell, Wis. Stat. §779.01(5) is not relevant to the question of whether the defendant committed fraud or defalcation in a fiduciary capacity; because it governs the operation of garnishments in cases of lien assignment, it is difficult to imagine how that section of §779 bears any relevance to the issues involved in this case.

More likely, the plaintiffs' reference to Wis. Stat. §779.01(5) was a typographical error. Wis. Stat. §779.0*2*(5)–one digit off from the section the plaintiffs cited–is the portion of Wisconsin's theft-by-contractor statute that prohibits theft by contractors involved in *private* work, as opposed to §779.16's prohibition against theft by contractors involved in *public improvement* work. Wis. Stat. §779.02(5), states in relevant part:

> [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid. . . .

§779.02(5) (emphasis added).

The parties–both the plaintiffs and the defendant–have conducted themselves throughout this litigation as if the plaintiffs had alleged a violation of Wis. Stat. §779.02(5). The Court concludes, given the substantive

22

allegations in the complaint and the evidence presented at trial, that the plaintiffs intended to base their claim on Wis. Stat. §779.02(5), rather than on §779.01(5), and analyzes the evidence accordingly.[4]

        1.    *The Plaintiffs Have Proven That a Trust Existed.*

Wis. Stat. §779.02(5) states that when an owner pays money to a prime or subcontractor for improvements, the money constitutes a trust fund in the hands of that prime or subcontractor. The beneficiaries of such a trust are the "laborers, suppliers and materialmen," as well as "owners and contractors." *See* <u>Matter of Thomas</u>, 729 F.2d 502, 506 (7th Cir. 1984). In order to determine whether a trust existed in this case, therefore, the Court must determine whether (1) an owner (2) paid monies (3) to a prime or subcontractor (4) for improvements.

        a.    Owners

The evidence demonstrated that the plaintiffs were "owners" of the Property, and of the project to build the dining room and install the egress windows. The defendant admitted, both in his amended answer and at trial, that there was a contract between the plaintiffs and Ward Builders.[5] The

---

    [4]    The plaintiffs did not allege, and presented no evidence to demonstrate, that the Property was a "public improvement," and the Court does not see that the defendant's actions–even if they constituted defalcation–violated Wis. Stat. Section 779.16. The Court will not, therefore, analyze the evidence under that provision.

    [5]    In his answer, the defendant referred to his company as "Ward *Construction*, Inc." The complaint referenced Ward *Builders*, Inc., and Ward

23

evidence demonstrated that the plaintiffs bought the Property from Ward Builders, and negotiated with Ward Builders to do the construction work on the Property. Accordingly, the evidence established that the plaintiffs were the "owners" of the Property, and thus established the first element necessary to demonstrate that a trust existed.

### b. Paid monies

The evidence also established that the plaintiffs, as owners, paid monies to Ward Builders. Plaintiffs' Exhibit 15, admitted at trial without objection, is a copy of a check from plaintiff Michael Levine to Ward Builders, dated February 28, 2007, in the amount of $20,000. This proves that the owners paid monies, and thus establishes the second element necessary to prove that a trust existed.

### c. To a prime contractor

Third, the evidence established that Ward Builders was the prime contractor for building the dining room and installing the windows. The plaintiffs proved that they entered into agreements with Ward Builders both to purchase the Property and to have Ward Builders do certain work, including building the formal dining room. There was no evidence that the plaintiffs

_____

*Builders*, Inc. was a registered Wisconsin corporation that listed the defendant as its registered agent. The Court assumes that in referring to "Ward *Construction*," the defendant was talking about Ward Builders.

24

contracted with anyone else to do this work. The evidence proves, therefore, that Ward Builders was the prime contractor for the construction work.

> d. For improvements

The final element the plaintiffs must prove to demonstrate that a trust existed is that the monies ($20,000) that the owners (the plaintiffs) paid to the prime contractor (Ward Builders) was paid "for improvements." It is here that the parties sharply diverge in their characterizations of the facts. The plaintiffs argued, in the complaint and at trial, that they gave Ward Builders $20,000 on February 28, 2007 for Ward Builders to perform work they had contracted with Ward Builders to do: build the formal dining room, install the egress windows, and build a nursery. The defendant argued at trial that the $20,000 was not for the construction work, but was for the purpose of paying off several liens against the property, which needed to be satisfied or cleared in order to enable the closing to occur.

The evidence does not support the defendant's version of events. The evidence indicated that up to a point, Ward Builders–like the plaintiffs–viewed the $20,000 as a payment for the construction work. On February 20, 2007, the plaintiffs signed the February 19, 2007 "Building Contract" calling for the construction "of a New Formal Dining Room to be added onto an existing Single Family Residence," the construction of "additional Living Space within an existing Garage Stall," and the installation of "Egress Windows to an existing Lower Level Foundation." Plaintiffs' Exhibit 12. The plaintiffs agreed to pay

25

$18,000 "as a deposit and part of the purchase price of this project." Id. On the same day, the defendant and plaintiff Michael Levine signed a document entitled, "Construction of New Formal Dining Room," which described the specifics of the dining room that Ward Builders was to build. Plaintiffs' Exhibit 13.

Eight days later, on February 28, 2007, the plaintiffs issued to Ward Builders the $20,000 check. Plaintiffs' Exhibit 15. On that same day, Ward Builders provided the plaintiffs with a document entitled "Receipt of Payment," signed personally by defendant Gordon Ward. That document read, "RECEIPT OF PAYMENT to Ward Builders, Inc. from Michael and Jamie Levine for a down payment in the amount of $20,000 (Twenty Thousand Dollars) towards the construction of a Nursery Suite, Formal Dining Room and installation of Egress Windows located at 1420 W. Stillwater Court, Mequon, WI 53092, per Building Contract dated February 19, 2007."

The receipt–signed by the defendant himself–proves that the defendant viewed the $20,000 the plaintiffs paid him as a down payment on the construction–*not* as funds needed to pay off pre-existing liens in order to clear title for the closing.

Six months later, Ward Builders wrote to Attorney Robert Levine, indicating that it no longer was willing to perform the construction. That letter, from Ward Builders construction manager John Pavelich and dated August 9, 2007, demonstrates that even at that point, Ward Builders viewed the $20,000

26

as a down payment on the construction project.  The letter stated, "Ward Builders has decided after careful consideration, not to move forward with the remodel contract at the above listed residence.  We would like to come up with a payment plan to reimburse Michael and Jamie for the downpayment." Plaintiffs' Exhibit 26.  The letter does *not* say, "We will not refund the $20,000, because as you know, that was for the purpose of paying off pre-existing liens in order to clear title so that the closing could occur."  The letter clearly refers to the money as a "downpayment" for the "remodel contract."

The defendant, in a deposition he gave on October 16, 2007, admitted that the $20,000 was for the construction project.  The following exchange occurred on page 10, lines 15-24, of the deposition transcript:

| Plaintiffs' counsel: | You received the sum of $20,000 on that date, did you not? |
|---|---|
| Defendant: | Yes, sir. |
| Q: | You knew that that money was to be used for a future endeavor, did you not? |
| A: | Yes, sir. |

Plaintiffs' Exhibit 30 at p. 10.

Later in that same deposition, the following exchanges occurred:

| Plaintiffs' counsel: | So that $20,000 that your company or you received was for the additional work to be performed; isn't that right? |
|---|---|
| Defendant: | That is correct. |

\*   \*   \*   \*   \*   \*   \*

27

| Plaintiffs' counsel: | You knew of your own knowledge that when you received this $20,000 that you had to either return the $20,000, or in the alternative to do the work that you were contracted to do; isn't that right? |
| Defendant: | Yes, sir. |

\*     \*     \*     \*     \*     \*     \*

| Plaintiffs' counsel: | Well, you knew that you were receiving $20,000 for future work to be performed by Ward Builders; isn't that right? |
| Defendant: | The scope of the contract was to include a formal dining room, the egress windows, and a nursery. Those were incomplete contracts because then at that point the nursery was canceled, therefore a new contract needed to be drawn, and I can't say if that ever happened. |

Id. at pp. 29-31.

From February through October of 2007, then, the defendant shared the plaintiffs' view that the $20,000 the plaintiffs gave him on February 28, 2007 was for the construction of the dining room and installation of the egress windows; in other words, for "improvements."

Months later, the defendant filed an amended answer in the current litigation. In paragraph 12 of that amended answer, the defendant stated, "As an affirmative defense, the payment was made for the express purpose of providing funds to Ward Builders, Inc. to enable it to clear title and convey the property to the Plaintiffs on February 28, 2007; accordingly, the parties never intended that the money be placed in trust for the benefit of contractors or

28

subcontractors, and plaintiffs are estopped from claiming the benefits of Chapter 779." Docket no. 8 at pp. 2-3. This assertion is contrary to all of the evidence discussed above. But Plaintiffs' Exhibit 17 sheds some light on the genesis of this new version of events.

Plaintiffs' Exhibit 17 is a copy of the Seller's Closing Statement and Rider prepared by Port Abstract and Title, LLC on February 8, 2007. It lists the seller of the property as "Ward Builders Incorporated," and the buyers as "Michael G. Levine and Jamie D. Levine, husband and wife." It shows "credits to seller" as $706,071.20. It shows "charges to seller" of $733,439.99. The "charges to seller" include items like the commission for the real estate broker, the title charges, the state transfer tax, the mortgage payoff, and the 2006 real estate taxes–all charges that would be due from the *seller*, Ward Builders. These were obligations that Ward Builders had incurred, and that it needed to pay, in order to be able to close the sale to the plaintiffs. The total of those charges exceeded the amount due from the buyers by $27,368.79. So in order for Ward Builders to be able to close the sale to the plaintiffs, it had to come up with $27,368.79. Id.

At the time of the closing, however, Ward Builders did not have $27,368.79. In the October deposition, the defendant testified as much. His counsel asked him, "Without the $20,000 did Ward Builders have that 27,000 some odd dollars available on February 28th, 2007?" The defendant answered, "No, sir." His attorney continued, "Without that $20,000 this transaction

29

would not have closed?" The defendant answered, "That's correct." The attorney then asked, "And that situation was communicated to Michael Levine?" The defendant answered, "That's correct." Plaintiffs' Exhibit 30 at pp. 51-52.

Ward Builders' bank records corroborate the fact that as of February 28, 2007, Ward Builders did not have enough money to pay the closing costs. Plaintiffs' Exhibit 19 is the February 28, 2007 monthly statement from AnchorBank for the Ward Builders account. That statement shows that as of February 28–the last day of the cycle–Ward Builders had a balance on hand of $7,471.57. It had incurred overdraft charges during the prior week when it had issued three NSF checks. It was the February 28, 2007 deposit of the $20,000 from the plaintiffs that brought Ward Builders' balance up to the amount necessary to allow it to pay the closing costs for the Property sale.

What appears to have happened, then, was this: The plaintiffs contracted with Ward Builders to build the formal dining room and install the egress windows, and gave Ward Builders a deposit of $20,000 for the purpose of getting that work done. But Ward Builders–whether because it underestimated the sale price it needed to charge for the Property, or because it neglected to consider all of its outstanding liabilities when negotiating with Michael Levine over changes in the various contracts, or for whatever other reason–did not have enough money on the closing date to pay the necessary costs to allow the sale to close. So, in order to enable the sale to go through, Ward Builders used

30

the $20,000 construction deposit to pay off the closing costs and liens, so that
the sale could close.

In his letter to the defendant's bankruptcy attorney dated August 28,
2007, John Pavelich characterized what happened this way:

> Michael Levine was informed by Ward Builders, Inc. that Ward
> Builders, Inc. needed to bring $27,368.79 to the closing in order
> for the closing to happen. Michael was informed that Ward
> Builders, Inc. did not have the money necessary to close. Michael
> was asked to pay Ward Builders, Inc. $25,000.00, which would be
> credited back to Michael as a down-payment on the
> remodel/addition work to be done in the future on the 1420 W.
> Stillwater Court property he was purchasing. Michael was able to
> come up with $20,000. Ward Builders, Inc. used Michael's
> $20,000 plus $7,368.79 of their money to close on the Stillwater
> Court property. Michael was aware of how the $20,000 was going
> to be used.

Plaintiffs' Exhibit 27.

Former Ward Builders employee David Watry told a similar story in the

written witness statement he provided to the Mequon Police Department dated

January 4, 2008:

> After receiving a tentative closing statement . . . John Pavelich told
> me it would be impossible to close on the house because Ward
> Builders needed to bring an additional $30,000.00 to the closing.
> Ward Builders did not have the money. There were several liens
> against the property. . . . Ward Builders would be unable to clear
> the title without paying the $30,000.00 out of pocket. Ward
> Builders' pockets were empty. John asked me f [sic] I thought
> Michael would be willing to make a down payment on the additions
> etc. to the house. I told John it would not hurt to ask since the
> deal would be dead without the money. I asked Michael to come to
> our office for a meeting. At the meeting John Pavelich and I
> explained the situation to Michael. We told Michael we needed a
> down payment of $30,000.00 for the additions, renovations and
> upgrades in order to get a clear title for the property and be able to

31

> close at the end of February. Without the $30,000.00, there could not be a closing. Michael said he would think about it. Within a couple of days, Michael said he would give us $20,000.00 as a down payment and Ward would have to come up with the rest of the money to close.

Defendant's Exhibit 105.

At trial, the defendant asserted that this version of events–the version related by Pavelich and Watry, and by the defendant in his October deposition–demonstrated that neither the plaintiffs nor the defendant ever intended the money to be for "improvements," and accordingly, that the defendant did not have the obligation to hold those funds in trust.

The Court disagrees. The Court concludes, from reading Pavelich's letter and Watry's statement (and hearing Watry testify at trial), that at every step of the way, the employees and agents of Ward Builders were telling the plaintiffs–specifically Michael Levine–that the $20,000 was a down payment on the construction work. Each of them called it a down payment. They told Levine it would be "credited" to the construction work. Nowhere in the record before the Court did Pavelich or Watry or the defendant ever represent that they told the plaintiffs something along the lines of, "Look–we don't have enough money to pay our closing costs. Will you pay them for us? Thanks." Each of them concedes that they told Michael Levine that the $20,000 was for the construction work.

Perhaps Ward Builders–and more specifically, the defendant–believed that at some point in the future it would have funds from other projects, or

32

from profits, to allow it to pay for the construction project it had agreed to perform for the plaintiffs. Perhaps not. It does not matter, for the purposes of determining whether a trust existed under Wisconsin law.

What *does* matter for the purposes of determining whether a trust existed is whether the monies the owner gave the prime contractor were for "improvements." The Court finds that the $20,000 that the plaintiffs gave the defendant on February 28, 2007 was for "improvements"–it was a down payment for the construction of the formal dining room and installation of the egress windows. Thus, the Court finds that the plaintiffs established the fourth element necessary to prove the existence of a trust–that the monies were for "improvements."

> 2.   *The Plaintiffs Have Proven That the Defendant was a Fiduciary of the Trust.*

The second element that the plaintiffs must prove to support their claim of theft by contractor is the fiduciary element–they must prove that the defendant was a "fiduciary" of the above-described trust. <u>Chase Lumber & Fuel Co. v. Koch</u>, 197 B.R. at 656. The Court concludes that the plaintiffs have proven this element.

The words of the statute demonstrate that Ward Builders was a fiduciary of the trust that was created when the plaintiffs paid Ward Builders the $20,000. The statute states that "all moneys paid to any *prime contractor* . . . by any owner for improvements, constitute a trust fund. . . in the hands of *the*

33

*prime contractor . . . .*" Wis. Stat. §779.02(5). Ward Builders, as the Court found above, was the prime contractor for the work to be done on the Property. Accordingly, Ward Builders was a fiduciary of the trust described in the preceding section.

It does not help the defendant to argue that Ward Builders, and not the defendant in his individual capacity, was the "fiduciary" of the "trust" the plaintiffs had paid, and therefore that the defendant, in his individual capacity, could not be subject to a nondischargeability action under §523(a)(4). The statute says otherwise. Section 779.02(5) states in relevant part that "[i]f the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation." Wis. Stat. §779.02(5). *See also*, Romes Design, Inc. v. Dinkins (In re Dinkins), 327 B.R.918, 923 (Bankr. E.D. Wis. 2005) ("If an individual debtor is an officer, director, or agent responsible for misappropriation by an entity, the debt will be excepted from the discharge of the individual.") Ward Builders, Inc. was a corporation, and the defendant was an officer, director or agent of that corporation at the time of the events involved in this case. Thus, he was a fiduciary of the trust in the same way that his corporation, Ward Builders, was a fiduciary of the trust.[6]

---

[6] Wisconsin cases also explain that an officer or director is personally liable for violations of §779.02(5) regardless of whether that officer or director personally benefitted from the misapplied trust funds. *See, e.g.*, Burmeister Woodwork Co., Inc. v. Friedel, 222 N.W.2d 647, 650 (Wis. 1974); Capen

3. *The Plaintiffs Have Proven That the Defendant Committed Defalcation While Acting as a Fiduciary of the Trust.*

The remaining element which the plaintiffs must prove in order to sustain their claim under §523(a)(4) is the element of "fraud" or "defalcation." The Court finds that the defendant committed defalcation when he used the $20,000 the plaintiffs gave him, not to build the dining room and install the egress windows, but to pay his company's closing costs so that his company could close on the sale of the Property to the plaintiffs.

Courts analyzing §779.02(5) claims have found that when a fiduciary uses the trust funds for something other than paying the subcontractors and materialmen who are or will be making the improvements, the fiduciary has committed defalcation. *See, e.g.*, <u>Bastian v. Roy</u>, 20 Wis.2d 470, 482-3 (Wis. 1963) ("misappropriation" of trust funds by using the funds for something other than paying the claims of subcontractors violated precedessor statute); <u>Capen Wholesale, Inc. V. Probst</u>, 280 Wis.2d 354, 363 (Ct. App. 1993) (fiduciary who used the trust funds "for purposes other than paying [the subcontractor]" violated §779.02(5)); <u>Matter of Thomas</u>, 729 F.2d at 505-506 ("Plaintiff satisfied its burden of establishing nondischargeability by showing

<u>Wholesale, Inc. v. Probst</u>, 509 N.W.2d 120, 124-125 (Wis. Ct. App. 1993). While it does not matter, therefore, whether the defendant himself received a direct benefit from the misapplied funds, the Court notes that in this case he *did* receive a direct benefit–had the defendant not chosen to use the misapplied funds to pay off the closing costs, the sale would not have taken place, and Ward Builders–and thus, the defendant–would have been stuck with the Property and all of its attendant costs.

35

that it paid defendants . . . to complete the work and the defalcation by defendants occurred when they used this trust fund for their own purposes.").

In 1994, the Seventh Circuit Court of Appeals decided <u>Meyer v. Rigdon</u>, 36 F.3d 1375 (7th Cir. 1994). <u>Meyer</u> involved a claim that a debt was nondischargeable under §523(a)(11), because the debt arose from an act of "fraud or defalcation while acting in a fiduciary capacity committed with respect to [a] depository institution or credit union." <u>Id.</u> at 1378. Defendant Rigdon argued that the plaintiff had alleged only that he was negligent, and that "mere acts of negligence are not 'defalcations.'" <u>Id.</u> at 1382. Thus, the Seventh Circuit took up the question of what a plaintiff must prove in order to prove "defalcation," as that term is used in the Bankruptcy Code.

After conducting an exhaustive review of cases interpreting the word "defalcation" (in both the §523(a)4 and §523(a)(11) contexts), the Seventh Circuit reached the following conclusion:

> a mere negligent breach of a fiduciary duty is not a "defalcation" under section 523(a)(11). "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.' " *In re Marvin*, 139 B.R. 202, 205 (Bankr. E.D. Wis.1992) (citing *Gleason v. Ihaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). Given this well-recognized principle, and the split of authority concerning whether a "defalcation" may result from negligence, we cannot say that Congress intended for a debt arising from a mere negligent breach of fiduciary duty to be excepted from discharge under section 523(a)(11).

<u>Id.</u> at 1385.

Two years later, in Chase Lumber & Fuel Co. v. Koch, Judge Martin held that after the Seventh Circuit's decision in Meyer, the issue in "defalcation" cases no longer was whether the defendant failed to pay the trust beneficiary, but whether the defendant's failure to do so "entailed bad faith or affirmative misconduct rather than mere negligence or mistake." Chase Lumber & Fuel Co. v. Koch, 197 B.R. 654 at 658. He conceded that "Meyer [was] not precise" about the standard of care, "suggesting only that something akin to 'reckless' may be the appropriate standard." Id. at 657. Nonetheless, given the Meyers holding that mere negligent breach of a fiduciary duty does not constitute "defalcation," Judge Martin found that a plaintiff asserting a §523(a)(4) claim had to prove, by a preponderance of the evidence, that more than mere negligence led to the fiduciary's failure to pay the beneficiary. Id. at 658. This Court agreed with Judge Martin in its decision in Ganther Constr., Inc. v. Ward (In re Ward), 417 B.R. 582, 592 (Bankr. E.D. Wis. 2009).

In this case, the evidence demonstrates that the defendant's use of the $20,000 for something other than constructing the dining room and installing the egress windows involved more than mere negligence. As the Court discussed above, the receipt that the defendant gave the plaintiffs for the $20,000 payment clearly stated that the payment was a down payment for the construction of the dining room and installation of the windows (as well as the later-abandoned nursery project). The letter John Pavelich sent Attorney Robert Levine stated that the money was a down payment for the remodel.

37

David Watry indicated in his witness statement that the funds were a down payment for the construction. The defendant himself admitted in his deposition that the money was for the construction. All of this evidence demonstrates that the defendant knew that the $20,000 was for "improvements."

As the Court also discussed above, the defendant (or someone with Ward Builders) decided that because Ward Builders didn't have enough money at the time of closing to pay the closing costs it owed, and because someone from Ward Builders had conveyed that fact to Michael Levine, Ward Builders could use the $20,000 to pay the closing costs. The defendant appears to have concluded that if he told Michael Levine that he did not have enough money to make the closing happen, and that he was going to "borrow" the construction down payment to pay the closing costs, the down payment no longer would constitute a down payment for improvements and would turn into something else. This sounds like a hybrid defense of necessity ("I needed to use the money to make the closing happen") and consent ("Michael Levine consented to my borrowing the funds to pay the closing costs")[7].

---

[7] The defendant characterized this more as a "waiver" or "estoppel" issue–whether the plaintiffs "waived" the sec. 779.02(5) argument when Michael Levine allegedly agreed to allow the defendant to "borrow" the $20,000 to use to pay closing costs. The Court finds that the plaintiffs did not "waive" this argument.

Case 08-02240-pp    Doc 17    Filed 03/15/10    Page 38 of 43

The Court could not find anything in words of the statute or in any reported case law validating such a defense. There is no defense of "necessity" to a theft-by-contractor claim. The fact that at the time he accepted the money or shortly thereafter, the defendant needed the money for some reason other than performing the contracted-for improvements does not remove those funds from the protection of the trust. In fact, the contrary is true. In Kraemer Bros., Inc. v. Pulaski State Bank, 138 Wis.2d 395 (Wis.1987), the Wisconsin Supreme Court explained that the whole purpose of §779.02(5) is to prevent a prime or general subcontractor from using the monies designated to pay the subcontractors and material suppliers for some other purpose:

> Sec. 779.02(5) is part of the Wisconsin Construction Lien Law. Construction lien statutes originated nearly 150 years ago to encourage construction by protecting the contractors and subcontractors of building projects. Sec. 779.02(5) is designed to protect subcontractors and material suppliers by making money paid by the owner to the contractors and subcontractors a trust fund for the subcontractors and material suppliers.

Id. at 399-400. See also, State v. Keyes, 304 Wis.2d 372, 385 at n.8 (Ct. App. 2007), aff'd, 309 Wis.2d 516 (Wis. 2008) ("As we explain, the legislative intent of § 779.02(5) is to protect owners and subcontractors from contractors who neglect to perform their fiduciary duty by failing to pay subcontractors in full or proportionally before paying themselves a profit.")

Nor is the defendant's "consent" argument persuasive. The Court found one case–involving an individual charged criminally with theft by contractor–which referred to consent. In State v. Wolter, 85 Wis.2d 353 (Ct.

39

App. 1978), the Wisconsin court of appeals discussed whether the State had proven all of the elements of the theft-by-contractor charge. It referred with approval to the jury instruction the defendant's counsel had prepared, which informed the jury that one of the elements that the State had to prove was that the defendant used the trust funds "without the consent of the mortgagee and contrary to the defendant's authority." Id. at 370 n.11. That instruction further stated, "Without the consent of the mortgagee means that there was no consent in fact by the mortgagee to use the money for any purpose other than the payment of all claims due or to become due from the defendant for labor and materials used in the improvements before all claims . . . were paid." Id.

The language of §779.02(5) does not contain a consent exception–it indicates that if the owner paid the monies to the prime contractor for improvements, the money is held in trust and the prime contractor is the trustee. The Court is not aware of any cases discussing a consent defense in the context of a civil application of the statute. Given that the beneficiaries of a §779.02(5) trust are the subcontractors and material suppliers, one wonders whether an owner could "consent" to a prime contractor/trustee misappropriating funds–particularly if the subcontractors and material suppliers already had performed.

But the Court need not answer that question for the purposes of deciding this case. There is ample evidence that the employees of Ward Builders and the defendant told Michael Levine that the $20,000 was for improvements. The

40

evidence further demonstrates that even if Michael Levine did consent to the defendant "borrowing" the money temporarily to pay closing costs (and the Court does not find that he did so consent), he still believed that he had paid that money for the purpose of getting the construction done, and that the defendant eventually would use the funds for that purpose. As the Court has stated, there is nothing in the record to indicate that the plaintiffs ever intended to lend or gift Ward Builders $20,000 solely for the purpose of allowing Ward Builders to pay its closing costs.

It is not clear whether, as of February 28, 2007, any subcontractors had incurred any costs in connection with building the dining room or installing the egress windows. (The excavation attempt occurred several months later, in June 2007.) But that does not require the Court to conclude that the defendant did not commit defalcation. As the Wisconsin Supreme Court has stated on more than one occasion, "Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of all claims due *and to become due* for that project is merely a trustee." State v. Stepniewski, 105 Wis.2d 261, 265 (Wis. 1982), quoting State v. Blaisdell, 85 Wis.2d 172, 178 (Wis. 1978). The defendant merely was a trustee of the $20,000 until such time as the work was completed and all subcontractors and material suppliers paid. As a trustee, he did not have the authority to use that money for any other purpose.

41

### 4. *Conclusion*

The Court therefore concludes that the plaintiffs have proven, by a preponderance of the evidence, that a trust existed, that the defendant was a fiduciary of that trust, and that the defendant committed defalcation in his capacity as fiduciary of the trust. Accordingly, the Court finds that the plaintiffs' claim is nondischargeable by the defendant in bankruptcy.

### V. CONCLUSION

For the reasons discussed above, the Court hereby finds that the plaintiffs did not prove by a preponderance of the evidence that the defendant incurred a debt through false representations contrary to 11 U.S.C. §523(a)(2)(A), and therefore finds in favor of the defendant, Gordon Ray Ward, on Count I of the complaint.

The Court further finds that the plaintiffs did prove by a preponderance of the evidence that the defendant committed defalcation in a fiduciary capacity when he used the $20,000 deposit to pay closing costs, contrary to 11 U.S.C. §523(a)(4), and therefore finds in favor of the plaintiffs, Michael and Jamie Levine, on Count II of the complaint.

Because the Court finds that the defendant incurred a debt of $20,000 to the plaintiffs by means of defalcation in a fiduciary capacity, the Court hereby **FINDS** that the defendant owes the plaintiffs a debt in the amount of **$20,000**, and that such debt is **NONDISCHARGEABLE**.

42

In the last paragraph of their complaint, the plaintiffs asked the Court to award "punitive damages for fraud and intentional disregard of their rights plus costs and fees for this action . . . ."  Given the above decision, the Court orders the parties to submit, no later than the close of business on **_Friday, April 2, 2010_**, any argument and case law in support of their respective positions with regard to the plaintiffs' request for punitive damages, costs and fees.  The Court also orders the plaintiffs to submit, along with the above argument and case law, an itemized statement of the costs and fees to which they argue they are entitled.

Once the parties have submitted these items and the Court has reviewed them, the Court will enter a separate order of judgment consistent with this decision.

# # # # #

43